# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pamela Angell, individually and as :
the Administratrix of the Estate of :
Thomas W. Bauer, Jr., deceased, :
      Appellant :
          :
    v.     : No. 458 C.D. 2015
         : Argued: November 17, 2015
James F. Dereno, Ross Township, :
and West View Borough   :


BEFORE: HONORABLE MARY HANNAH LEAVITT, Judge[1]
     HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE ANNE E. COVEY, Judge

OPINION
BY JUDGE LEAVITT        FILED: March 10, 2016

    Pamela Angell, individually and as administratrix of the estate of Thomas W. Bauer, Jr. (Decedent), appeals two orders of the Court of Common Pleas of Allegheny County (trial court) granting summary judgment to Ross Township and West View Borough (collectively, Municipalities), defendants in Angell's tort action. Angell seeks to recover damages for her son's death, which she attributes to the dangerous condition of a road where her son's motorcycle was clipped by an oncoming truck, within feet of the boundary between Ross Township and West View Borough. Angell's expert opined that had the Municipalities installed traffic control devices, the fatal accident would not have occurred. Angell contends that the trial court erred in dismissing the Municipalities from her action

---

[1] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

by finding facts that were for a jury to decide and by not giving her expert's report and deposition evidence any probative value. For the reasons that follow, we reverse both orders.

### Background

The accident occurred on Bellevue Avenue, a narrow two-lane, two-way road without shoulders or a center line marking. Bellevue Avenue runs through a residential neighborhood, and the Municipalities permit parking on one side of the road, which further narrows the room for passing vehicles.[2] Bellevue Avenue, which runs north and south, meets Schwitter Avenue in a T-shaped intersection. The boundary line between the Municipalities bisects Bellevue Avenue in the middle of the crossing with Schwitter Avenue. Bellevue north of the intersection lies in Ross Township, and Bellevue south of the intersection lies in West View Borough.

The intersection of Schwitter Avenue and Bellevue Avenue is located at the top of a hill. After crossing the boundary from West View Borough to Ross Township, Bellevue immediately descends a steep hill. Vehicles traveling in either direction on Bellevue cannot see oncoming vehicles until they reach the crest of the hill at the intersection with Schwitter, where both roads are level.

On May 9, 2011, in mid-day, Decedent was heading down the hill on Bellevue on his motorcycle. At the same time, James F. Dereno was heading up the hill in his pickup truck. Just below the intersection of Bellevue and Schwitter, in Ross Township, Decedent collided with Dereno. Dereno's left front bumper hit Decedent's motorcycle, doing minor damage to Dereno's truck. However, the

---

[2] The speed limit is 25 mph.

force of the impact was enough to cause Decedent's motorcycle to fly over the guardrail on the east side of Bellevue and land at the bottom of the steep embankment protected by the guardrail. Decedent was 19 years old.

Angell filed a wrongful death and survival action against Dereno, Ross Township and West View Borough. Her complaint alleged that Dereno "negligently travel[ed] in the Decedent's lane or the middle of the road so as to cause the collision with the Decedent." First Amended Complaint, ¶18(a); Reproduced Record at 29a (R.R. ___). Her complaint also alleged that the fatal accident was the direct, legal and proximate result of the Municipalities' negligence:

a. In failing to properly design, maintain, supervise and control Bellevue Avenue;

b. In allowing parking on the side(s) of Bellevue Avenue (particularly the south bound side), thus turning the two-way Avenue into a single lane; and

c. In failing to place signs or otherwise warn the public, such as the Plaintiff Decedent, of the dangerous Avenue condition; and

d. In failing to correct the dangerous condition in a reasonable time when it could be charged with actual notice or could reasonably be charge[d] with notice of the dangerous condition.

First Amended Complaint, ¶¶25, 32; R.R. 32a, 34a. The alleged dangerous condition consisted of the narrowness of Bellevue Avenue and the limited sight distance caused by the hill. First Amended Complaint, ¶¶13-14; R.R. 28a.

The complaint asserted that Angell's claim against the Municipalities fell within the "streets" exception to governmental immunity found in a chapter of the Judicial Code that is commonly referred to as the Political Subdivision Tort

3

Claims Act (Tort Claims Act), 42 Pa. C.S. §8542(b)(6). Section 8542(b)(6)(i) provides that a local agency may be liable for a "dangerous condition of streets owned by the local agency ...." 42 Pa. C.S. §8542(b)(6)(i).

All the defendants filed answers denying liability, and the parties engaged in discovery. At his deposition, Dereno testified that he lives on Bellevue Avenue in West View Borough and has driven on that road "at least two, three times a day seven days a week … since July of '07." R.R. 262a. Dereno testified that Bellevue is dangerous because of the limited sight distance caused by the hill and the narrowness of the roadway. He testified that he slows down when heading up Bellevue towards the intersection because people turning from Schwitter cannot see oncoming vehicles on Bellevue. He acknowledged telling police on the day of the accident that he had been moving towards the center of the road. He did so to avoid vehicles that are often parked on the west side of Bellevue, in both Municipalities, and cannot be seen because of the limited sight distance. As it happened, there were no cars parked on his side of Bellevue that day. Dereno could not be sure he was in his own lane at the moment of collision because there are no lane markings. Dereno believed that a stop sign on Bellevue at the top of the hill on the West View side of the boundary would have made a difference because it "would make people stop and actually look and [give] the other person time to get to the crest" on the Ross Township side. R.R. 256a.

Angell also lives on Bellevue Avenue, as did her son before his death.[3] She testified that Bellevue is dangerous at its intersection with Schwitter. Angell described the road as a "perfect storm" for an accident because of "the

---

[3] At the time of the accident, Decedent resided with his mother at 111 Bellevue Avenue and Dereno resided at 113 Bellevue Avenue.

slope, the blindness, the narrowness." R.R. 265a. She had warned Decedent, who lived with her, about the danger. Angell did not know whether cars had been parked on Bellevue Avenue at the time of the accident.

Angell secured affidavits from neighbors Antonia Mahon, Tod Morrow, Wayne Kennelly and Barbara Kennelly. All described seeing officers from both Municipalities patrolling the intersection of Bellevue and Schwitter before the fatal accident. Mahon attested that prior to the accident, she personally tried to get West View to install a stop sign on Bellevue at the top of the hill before it crossed Schwitter. Barbara Kennelly attested that she has witnessed several vehicle accidents at the Schwitter and Bellevue intersection. Prior to the fatal accident, she complained to West View about the dangers posed by the hill on Bellevue and its intersection with Schwitter. After the fatal accident, both Municipalities installed warning signs on opposite sides of Bellevue stating "Danger Blind Hill Slow."

The Municipalities filed separate motions for summary judgment. Both argued that Angell's evidence did not show that they had been negligent with respect to a dangerous condition of the street or that their alleged negligence caused the accident. On April 8, 2014, the trial court denied both motions.

On November 24, 2014, Angell secured an expert report from Ronald W. Eck, P.E., Ph.D. Angell's Brief, Appendix F. Dr. Eck studied the circumstances of the accident and the conditions on Bellevue Avenue. Dr. Eck reviewed the pleadings in this case; traffic speed and volume data collected in October 2014 by David E. Wooster and Associates, Inc.; and relevant street engineering literature. Relying upon several treatises, Dr. Eck determined that Bellevue Avenue needed a minimum width of 22 to 28 feet. Dr. Eck measured

Bellevue at approximately 16 feet wide at the point of the accident, 19 feet wide at the intersection with Schwitter Avenue and 18 feet wide south of the intersection, at the top of the hill where Bellevue is level. Dr. Eck also opined that the guardrail on the east side of Bellevue, as it descended into Ross Township, further reduced Bellevue's functional width. This is because motorists tend to "shy away" from a fixed obstruction, such as a guardrail, particularly where there is no shoulder. Eck Report at 5. Dr. Eck concluded that the "width of Bellevue Avenue is too narrow to fulfill its intended functions and does not comply with accepted design practices." *Id.* He stated that the "short crest vertical curve" at the crest of the hill prevents motorists from seeing oncoming traffic. *Id.*

Dr. Eck opined that the narrow roadway, on-street parking and limited sight distance over the hill created a dangerous roadway condition that was a substantial contributing factor to the crash. Dr. Eck believed that the danger should have been apparent to both Municipalities, and they should have responded with "limited sight distance" warning signs on both sides of the intersection. He opined that a head-on collision, of the sort that caused Decedent's death, was foreseeable.

Dr. Eck addressed the use of multi-way stop controls at the intersection to mitigate the dangerous conditions on Bellevue Avenue. The Federal Highway Administration provides that multi-way stop controls should be based on an engineering study, including minimum traffic values.[4] PennDOT

---

[4] The Federal Highway Administration guidelines provide that a four-way traffic stop requires that 300 vehicles per hour enter the intersection from a major street and 200 vehicles per hour from a minor street. Dr. Eck used traffic data on the intersection collected by David E. Wooster and Associates, which showed that 70 vehicles per hour entered the intersection. This number was too low to require the installation of a multi-way stop control under Federal standards.

6

Publication 212 states that multi-way stops are not necessary for limited sight distance "unless there is no practical method of improving the sight distance or reducing the speed limit to satisfy the minimum corner sight distance values." Eck Report at 6. Accordingly, under PennDOT's criteria, multi-way stop controls were warranted on Bellevue because there was no practical way to improve the sight distance or to lower the existing speed limit of 25 mph.

Dr. Eck did not believe there should be a stop sign on Bellevue Avenue (in Ross Township) as it climbs the hill toward the intersection with Schwitter. A stop sign on the uphill grade would make it difficult for motorists to pull away from the intersection in inclement weather. However, a stop sign on the other side of Bellevue at the top of the hill (in West View Borough) with a sign stating "opposing traffic does not stop" would make Bellevue safer. It would mitigate the defective roadway design. Dr. Eck opined that West View should have installed this stop sign as part of its routine roadway management. Dr. Eck opined that the lack of traffic control devices on Bellevue caused the crash and Decedent's fatal injuries.

The Municipalities again moved for summary judgment. They argued that the evidence, even with Dr. Eck's opinion, did not create triable issues of fact on causation, duty and prior notice of a dangerous condition. On March 4, 2015, the trial court issued two orders: one granting summary judgment in favor of Ross Township and the other granting summary judgment in favor of West View Borough. Each order dismissed Angell's claim against the Municipalities with prejudice.

The trial court concluded that because Angell's complaint alleged that Dereno caused the accident by deviating from his lane of travel, the dangerous

7

condition of the road was irrelevant. The trial court found other deficiencies in Angell's evidence. The trial court found that the neighbors' affidavits did not establish that the Municipalities had actual notice of the dangerous condition on Bellevue. The trial court did not discuss constructive notice or Dr. Eck's opinion that the danger should have been apparent to both Municipalities. The trial court found that Dr. Eck did not identify the type of appropriate traffic control device that would remediate the danger or establish that the Municipalities had authority to install a device without PennDOT's approval. For these reasons, the trial court refused to consider Dr. Eck's report.

Dereno remains a defendant in the case. By agreement of the parties, the trial court certified both orders as final for purposes of an interlocutory appeal to facilitate resolution of the entire case. The present appeal followed.[5]

### Applicable Standards for Summary Judgment

Summary judgment may be granted where there is no genuine issue of material fact and where the moving party is entitled to judgment as a matter of law. *Summers v. Certainteed Corporation*, 997 A.2d 1152, 1159 (Pa. 2010). In considering a motion for summary judgment, we examine the evidence of record in a light most favorable to the non-moving party, accepting as true all well-pled facts and reasonable inferences to be drawn from those facts. *Sellers v. Township of Abington*, 67 A.3d 863, 867 (Pa. Cmwlth. 2013). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Chanceford Aviation Properties, L.L.P. v. Chanceford Township Board of Supervisors,* 923 A.2d 1099, 1103 (Pa. 2007). If the non-moving party fails to

---

[5] Dereno is not participating in the appeal.

8

adduce sufficient evidence on an essential issue for which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *Sellers*, 67 A.3d at 867. Summary judgment raises a question of law over which our scope of review is plenary and our standard of review is *de novo*. *Id*. at 868; *Chanceford Aviation*, 923 A.2d at 1103. We resolve questions of law based on the entire record. *Summers*, 997 A.2d at 1159.

## Issues

Angell argues that the trial court erred. She contends that her evidence established the existence of a dangerous condition on Bellevue Avenue that contributed to the fatal accident. Angell argues that it is for a jury to decide whether the Municipalities had actual or constructive notice of a dangerous condition. The trial court erred in finding facts on this issue. Angell also argues that the trial court erred in concluding that Dr. Eck's report did not establish that the Municipalities had authority to install traffic control devices to mitigate the dangerous street conditions.

## Tort Claims Act

Under the Tort Claims Act, local agencies are generally immune from tort liability unless immunity is expressly waived. *See* 42 Pa. C.S. §8541.[6] Pursuant to Section 8542(a) of the Tort Claims Act, the General Assembly has waived immunity where the following conditions are satisfied: (1) damages would

---

[6] Section 8541 states:

> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

42 Pa. C.S. §8541.

9

be recoverable under statutory or common law if the injury were caused by a person not protected by governmental immunity; (2) the local agency's negligent act caused the injury; and (3) the local agency's alleged negligence falls within one of the eight enumerated exceptions to governmental immunity listed in 42 Pa. C.S. §8542(b).[7]

As noted above, this case involves the streets exception to governmental immunity. Section 8542(b)(6)(i) of the Tort Claims Act provides that a local agency may be liable for:

> A dangerous condition of streets owned by the local agency, except that the claimant to recover must establish that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred and that the local agency had actual notice or could reasonably be charged with notice under the circumstances of the dangerous condition at a sufficient time prior to the event to have taken measures to protect against the dangerous condition.

---

[7] Section 8542(a) states as follows:

> (a) Liability imposed.--A local agency shall be liable for damages on account of an injury to a person or property within the limits set forth in this subchapter if both of the following conditions are satisfied and the injury occurs as a result of one of the acts set forth in subsection (b):
>
> > (1) The damages would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person not having available a defense under section 8541 (relating to governmental immunity generally) or section 8546 (relating to defense of official immunity); and
> >
> > (2) The injury was caused by the negligent acts of the local agency or an employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (b). As used in this paragraph, "negligent acts" shall not include acts or conduct which constitutes a crime, actual fraud, actual malice or willful misconduct.

42 Pa. C.S. §8542(a).

42 Pa. C.S. §8542(b)(6)(i). In short, Angell had to show that the dangerous condition on Bellevue Avenue presented a foreseeable risk of a side-swipe collision and that the Municipalities had actual or constructive notice of the danger.

**Causation**

Dr. Eck opined that Bellevue Avenue was dangerous because it was narrow and offered limited sight distance on both sides of the boundary line. The Municipalities do not challenge the existence of this dangerous condition, nor did the trial court. Rather, the trial court concluded that Angell did not establish that the dangerous condition of the road *caused* the accident because Angell alleged in her complaint that Dereno caused the collision by deviating from his lane of travel.

Angell argues that her evidence established that the dangerous condition on Bellevue Avenue was a substantial factor in the fatal accident. Dr. Eck opined that Bellevue Avenue was far too narrow to accommodate safely two-way traffic, especially where motorists also had to deal with the blind hill, parked cars on the street and a guardrail. Dr. Eck opined that these dangerous conditions were a substantial contributing factor to the crash and explained how they contributed to the accident. This evidence was sufficient to defeat the Municipalities' motions for summary judgment.

Both Municipalities contend that the dangerous condition was irrelevant because Dereno disobeyed the law by entering the oncoming lane of traffic. The Municipalities argue that they cannot be held liable for the extraordinary occurrence where a driver disobeys traffic laws.

In support, the Municipalities rely upon *Burton v. Terry*, 592 A.2d 1380 (Pa. Cmwlth. 1991), as did the trial court. In *Burton*, a motorist was injured when his car was struck by a vehicle that had entered the intersection after

11

traveling the wrong way on a one-way street in Philadelphia. The intersection was such that vehicles travelling the correct way could not see traffic entering the intersection from the wrong direction. This Court affirmed the grant of judgment *n.o.v.* in favor of the City because the "alleged dangerous condition was created by the driver who ignored the one-way traffic signs appropriately posted by the City and travelled the wrong way on a one-way street." *Id*. at 1384. In so holding, we also observed that a municipality has a duty to construct and maintain its streets so that they will "be in a condition 'reasonably' safe for the use of the public ...." *Id*. at 1383. However, a municipality cannot be held liable for an "extraordinary" accident that results from a driver's disobeying posted traffic signs. *Id*. at 1385.

*Burton* is distinguishable. In *Burton*, the street was reasonably safe for its *intended* use. The City did not have the responsibility to address the danger created by a driver who drove illegally in disregard of the City's posted one-way signs. Here, by contrast, there is no evidence that Dereno disobeyed a posted traffic sign. Further, Angell's expert evidence established that Bellevue is not reasonably safe for its intended use of two-way vehicle traffic.

Dereno told police he began moving to the center of the road out of concern that there might be parked cars on his side of Bellevue that he could not see. Dereno also testified he believed he was driving within his own lane of travel when the accident occurred. However, he also stated that the lanes on Bellevue are difficult to discern:

> Well the road is so narrow to me that when you're in your lane you're very close to the so-called center of that road that they call the center of the road. But there is no indication of the center of the road.

12

R.R. 255a. Dereno also confirmed that motorists at the top of the hill cannot see oncoming vehicles until those vehicles crest the hill.

There is a dispute on the factual question of whether the dangerous condition or Dereno's driving or both caused the crash. This defeats the Municipalities' motions for summary judgment on the issue of causation. *See Drew v. Laber*, 383 A.2d 941 (Pa. 1978) (where a motorist who moved to the edge of the road to avoid an oncoming vehicle struck a pedestrian walking along a narrow road, the question of whether the dangerous narrowness of the road was a substantial contributing factor was for the jury to decide).[8] The trial court erred in granting summary judgment on the issue of causation.

### Notice

Angell next argues that the trial court erred in holding that her evidence was not sufficient to show that the Municipalities had actual or constructive notice of the dangerous condition. She contends that the trial court made findings of fact about notice, which are for the jury to decide. We agree.

In order for a municipality to be held liable for injury caused by a dangerous condition of a street, the municipality must have notice of the condition and a reasonable time to respond. 42 Pa. C.S. §8542(b)(6)(i). The plaintiff must show "that the local agency had actual notice *or could reasonably be charged with notice* under the circumstances of the dangerous condition," *i.e.*, constructive notice. *Id*. (emphasis added). "Constructive notice requires that the dangerous

---

[8] The Municipalities argue that Angell has not established causation against them because there were no cars parked on Bellevue at the time of the accident. Further, there is no evidence that there was insufficient space for motorists travelling in opposite directions to pass each other safely if they stayed in their respective lanes of travel. Dr. Eck's report and Dereno's testimony create issues of fact on these points.

13

condition be apparent upon reasonable inspection." *Department of Transportation v. Patton*, 686 A.2d 1302, 1304 (Pa. 1997). Whether a local agency had either actual or constructive notice of a dangerous condition is a question of fact for the jury. *Id*. at 1305; *Medicus v. Upper Merion Township*, 475 A.2d 918, 921-22 (Pa. Cmwlth. 1984). A court may decide the issue "only when reasonable minds could not differ as to the conclusion." *Patton*, 686 A.2d at 1305. However, "[i]f there is any dispute created by the evidence, the court is not permitted to decide the issue." *Id*.[9]

Angell argues that the affidavits show that West View Borough had actual notice that the intersection of Bellevue and Schwitter Avenues was unsafe based on the complaints made by Barbara Kennelly and Antonia Mahon. This evidence was specific on the location and type of dangerous condition. Relying on *Patton*, Angell further argues that the dangerous condition was apparent upon reasonable inspection, noting that police officers from both Municipalities had been present on patrol at or near the intersection. This constitutes constructive notice of the dangerous condition.

The Municipalities disagree. Ross Township points out that Angell's affidavits described complaints made only to West View Borough. West View

---

[9] In *Patton*, PennDOT was sued after a large tree branch overhanging a Commonwealth roadway fell on a car, killing a motorist. The plaintiff presented expert evidence that the tree had been "topped" decades earlier, a condition which should raise a "red flag" to a well-trained tree inspector because topping can lead to tree decay and falling limbs. PennDOT responded that the tree was sound and that there was no evidence the topped condition was visible from the ground. The case fell under the real estate exception to sovereign immunity, which has a notice requirement identical to the streets exception. The Supreme Court held that the evidence created a question of fact for the jury as to whether PennDOT had either actual notice or constructive notice of a dangerous condition of the tree because such would have been apparent upon reasonable inspection.

argues that the neighbors' affidavits are not specific enough on the danger to constitute actual notice. Both Municipalities argue that absent evidence of a previous sideswipe between two oncoming vehicles, one cannot infer that the patrolling police officers had constructive notice.[10]

Antonia Mahon, Tod Morrow, Wayne Kennelly and Barbara Kennelly, all of whom reside in the neighborhood, submitted affidavits. They recalled seeing officers from Ross Township and West View Borough patrolling Bellevue Avenue near the crash site prior to the fatal accident. Mahon attested that prior to the accident, she personally tried to persuade West View to put in a stop sign to address the "dangers posed by the intersection of Schwitter Avenue and Bellevue Avenue." Angell's Brief, Appendix H. Barbara Kennelly attested that she has witnessed several vehicle accidents on Schwitter and Bellevue. Kennelly twice complained to West View about the "dangers posed by the intersection" and told the Borough "that it needed to make the intersection safer for vehicles traveling on Schwitter Avenue and Bellevue Avenue." Angell's Brief, Appendix K.

_____

[10] In support, the municipalities cite *Kennedy v. City of Philadelphia*, 635 A.2d 1105 (Pa. Cmwlth. 1993), *affirmed by evenly divided court*, 658 A.2d 788 (Pa. 1995), and *Fenton v. Philadelphia*, 561 A.2d 1334 (Pa. Cmwlth. 1989), *affirmed without opinion*, 585 A.2d 1003 (Pa. 1991). In both *Kennedy* and *Fenton*, this Court held that the City of Philadelphia could not be charged with actual or constructive notice of a dangerous condition that caused an injury because the plaintiffs did not present evidence that the City was informed or knew of a specific dangerous condition (lack of dotted lines on the street separating a pedestrian area from the vehicle lanes in *Kennedy* and lack of lane markings and a designated left-turn lane in *Fenton*) or that similar prior accidents had occurred. The plaintiffs spoke of only general dangerous conditions. Notably, although this Court in both cases referenced constructive notice, we did not define constructive notice or discuss it apart from actual notice. In any case, the Supreme Court's decision in *Patton*, 686 A.2d 1302, which was decided after *Kennedy* and *Fenton*, is dispositive on whether actual or constructive notice is a question for a jury.

15

The trial court acknowledged that *Patton*, 686 A.2d 1302, established that whether a municipality has had actual or constructive notice is a question for the jury to decide. Nevertheless, the trial court concluded that notice was not an issue for the jury in this case, explaining:

> As none of the affidavits specify the dangers referred to, they cannot support the contention that the municipal defendants were on notice of a specific dangerous condition. Further, Ma[h]on and Kennelly only reported dangers to West View Borough, not Ross Township.

Trial court op. at 5. We disagree.

Mahon and Kennelly reported the "dangers posed by the intersection of Schwitter Avenue and Bellevue Avenue" without specifying the narrowness and limited sight distance on Bellevue. However, Mahon specifically told West View that a stop sign was needed on Bellevue at the intersection, the identical conclusion reached by Dr. Eck. Notably, both Municipalities argue that the dangers presented by the narrow street and limited sight distance were so obvious that signs were not necessary. This argument is at odds with their contention that they did not have constructive notice of the danger.

In any case, there is a factual dispute on the question of constructive notice. Police officers from the Municipalities patrolled near the crash site prior to the fatal accident, and Dr. Eck opined that the danger should have been identified on a routine inspection by the Municipalities. Constructive notice is a question of fact to be decided by the jury, not the court. If the dangerous conditions, *i.e.*, a too-narrow street with limited sight distance, are deemed by the jury to be "apparent upon reasonable inspection," the jury could find that the Municipalities had notice.

16

*Patton*, 686 A.2d at 1304. The trial court erred in granting summary judgment on the issue of actual and constructive notice.

**Expert Report on Traffic Control Devices**

The trial court rejected Dr. Eck's report for the stated reason that Dr. Eck did not establish that the Municipalities had authority to install traffic control devices or that PennDOT would have approved them. Angell contends that the trial court erred because, in fact, the report did establish that the Municipalities could have, and should have, installed traffic control devices and did not need PennDOT's approval to do so.

Municipalities have a duty to make their streets reasonably safe for their intended purpose. *Starr v. Veneziano*, 747 A.2d 867, 872 (Pa. 2000). Our Supreme Court has held that

> a municipality's responsibility to maintain its roadways free of dangerous conditions could include a duty to install an appropriate traffic control device where to do so would alleviate a known dangerous condition.

*Id*. To establish a duty of care on the part of a municipality to install a traffic control device, the plaintiff must demonstrate that:

> 1) the municipality had actual or constructive notice of the dangerous condition that caused the plaintiff's injuries; 2) the pertinent device would have constituted an appropriate remedial measure; and 3) the municipality's authority was such that it can fairly be charged with the failure to install the device.

*Id*. at 873.

In *Starr*, the Supreme Court held that an "expert opinion expressed within a reasonable degree of engineering certainty is *generally* required" for the identification of the remedial device. *Id*. (emphasis added). It also explained that

17

the plaintiff must show that "more likely than not, PennDOT's approval would have been forthcoming." *Id*. at 874.[11]

In *Starr*, the accident occurred as the plaintiff made a left-hand turn from a township road onto a state highway in an area with limited sight distance. Starr sued PennDOT, which joined the municipality. PennDOT asserted that the municipality should have installed a stop sign at the intersection to restrict access onto the state highway. Starr received a jury verdict in her favor, and this Court affirmed. The Supreme Court reversed, holding that Starr's evidence did not make her case because her expert's opinion was not supported by a traffic or engineering study. Further, Starr did not prove that PennDOT's approval of the traffic control device, which was required, would have been forthcoming.

Thereafter, in *Wenger v. West Pennsboro Township*, 868 A.2d 638 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 890 A.2d 1062 (Pa. 2005), this Court clarified the scope of *Starr*. In *Wenger*, an accident occurred when the plaintiff's vehicle was hit at the intersection of two township roads at the crest of a hill, at a point of limited sight distance. At the time of the accident, there were no stop signs at the intersection, but thereafter the township installed them.

Wenger sought damages from the township alleging that her injuries were caused in part by the absence of stop signs, warning signs or a reduced speed limit. The trial court granted the township's motion for summary judgment because Wenger's expert did not meet the standards established in *Starr*. This Court reversed.

---

[11] The first requirement was undisputed in *Starr, i.e.*, that the municipality had actual or constructive notice.

18

In doing so, we explained that PennDOT's approval of a traffic control device was not required because, unlike the situation in *Starr*, the intersection did not involve a state highway. A traffic expert may express an opinion on the appropriate remedial measure on a township road using "any combination of sources." *Wenger*, 868 A.2d at 643-44. Further, "an inquiry that conforms to generally accepted engineering standards and practices will produce the factual predicate identified in *Starr* as [a] requisite for an expert opinion." *Id.* at 644. We also held that evidence of post-accident remedial measures are admissible but only for the limited purpose of showing that the proposed traffic control device was appropriate; it does not bear on the ultimate issue of negligence. *Id.* at 645. Finally, we held that technical studies relied upon by the traffic expert need not be admitted into evidence in discovery or at trial so long as they are identified by the expert. *Id.*

*Wenger* is dispositive. Here, the trial court's reliance on *Starr* was misplaced because *Starr* involved an intersection between a state highway and a township road, where PennDOT's approval of a traffic control device was required. PennDOT's approval is not needed for traffic control signs where the intersection lies between two township roads. *Wenger*, 868 A.2d at 643-44. Dr. Eck's report identified appropriate remedial traffic control measures, namely, warnings of limited sight distance signs in both directions, and a stop sign in West View just before Bellevue crosses Schwitter.[12] He also identified the sources he

---

[12] Dereno also testified he believes the limited sight distance near the crest of the hill is dangerous and warrants a stop sign on the West View Borough side of the intersection, stating:

> You have to…have a stop sign so everybody [has] more time to evaluate people getting there, you know.

R.R. 258a.

19

relied upon in reaching his conclusions. Dr. Eck did not have to append the Wooster study and other treatise authority to his report, as the trial court believed. In short, the trial court erred in rejecting Dr. Eck's report, which is admissible. Its weight must be determined by the jury.

### Summary Judgment Analysis

The Municipalities contend that even if Dr. Eck's report is admissible, this Court should affirm the trial court's grant of summary judgment on other grounds. They argue that the absence of "limited sight distance" warning signs was irrelevant because they state the obvious, *i.e.*, that the motorist's view of the road ahead is limited. More importantly, both Dereno and Decedent knew about the danger because they lived on Bellevue.[13] Therefore, traffic control devices would not have relayed information those two drivers did not already know and, thus, would not have prevented the fatal collision. Dr. Eck recommended warning signs reading "Limited Sight Distance" in both Municipalities. Eck Report at 6. After the accident, both Municipalities installed warning signs stating "Danger Blind Hill Slow" on Bellevue, which show the feasibility of such devices.

It is undisputed that Dereno and Decedent often traveled Bellevue Avenue. Dereno testified he slowed down approaching the intersection because motorists turning left from Schwitter could not see oncoming traffic. Angell testified that she had warned Decedent of the danger. However, Dereno did not testify in his deposition that signs would have been meaningless on the day in

---

[13] The drivers' knowledge of the dangerous condition was not a factor in the trial court's decision.

20

question. Of course, there can be no statement from Decedent about how a warning sign may have affected his conduct.

The evidence established that Bellevue Avenue is dangerous. It is too narrow to fulfill its intended function, and it affords only limited sight distance. The lack of lane markings was noted by Dereno, who could not be sure he was entirely within his own lane of travel at the point of impact. Whether the drivers' knowledge made the lack of warning signs irrelevant cannot be presumed. Warning signs function not just to inform motorists but to remind them of a danger, particularly drivers who may be operating in a familiar location on "automatic pilot." In short, whether the knowledge and experience of Dereno and Decedent rendered warning signs irrelevant presents a question of fact that must be decided by a jury.

We turn then to the remaining issue of a stop sign. Dr. Eck opined that West View Borough should have placed a sign on Bellevue at the top of the hill.[14] Dr. Eck opined that this stop sign would have mitigated the danger and prevented the accident because it would have required Decedent to stop before descending the hill. Dr. Eck asserted that requiring a motorist to stop would give time for a vehicle ascending the hill to come into view before the stopped motorist resumed his trip through the intersection. Whether the recommended stop sign would have prevented the accident is a question for the jury. As our Supreme Court has explained, "the question of whether a municipality has taken the

---

[14] Stated otherwise, stop signs were needed on two of the three points of the T-shaped intersection, and both in West View Borough. One already exists on Schwitter Avenue. Dr. Eck opined that another should be installed on Bellevue where it joins Schwitter.

Dr. Eck did not recommend a stop sign in Ross Township or opine that it would have prevented the accident. There is nothing for a jury to decide in this regard.

requisite precautions which it owes to travelers is one for the jury." *Drew*, 383 A.2d at 943.

West View argues that even if these factual questions are resolved against it, it cannot be held liable because a local agency can be held liable only for a "dangerous condition of streets *owned by* the local agency." 42 Pa. C.S. §8542(b)(6)(i) (emphasis added). The accident occurred in Ross Township. The portion of the street "owned by" West View Borough, which is straight and level, had nothing to do with the accident that happened in Ross Township. We reject this logic.

Although the crash occurred in Ross Township, the stop sign recommended by Dr. Eck would stop motorists before they continued on to the descent, giving time for ascending vehicles to appear. The purpose of any traffic control device is to prevent an accident somewhere beyond the device, which may or may not be located in the same municipality given the fact that streets traverse municipal boundaries and intersect state highways. Notably, in *Starr*, the accident occurred on a state road where it intersected a township road. The dangerous condition, which contributed to the accident on the state highway, was located in the township. The Supreme Court did not hold in *Starr* that the township was free of liability because the accident occurred on a state highway, *i.e.*, land not owed by the township. The Tort Claims Act holds municipalities liable for their dangerous street conditions and does not limit that liability to accidents that occur within their boundaries.

Dr. Eck opined that Bellevue Avenue was dangerous on both sides of the intersection. In spite of its narrowness, both Municipalities allow parking on the west side of Bellevue, which further narrows the road. Indeed, Dereno told

22

police he was moving toward the center of the road in anticipation of encountering parked cars on his side of the street. It is for the jury to decide whether the Municipalities should have taken steps to mitigate the danger and what steps should have been taken and whether they could have prevented the fatal accident.

## Conclusion

Material questions of fact preclude the grant of summary judgment to Ross Township and West View Borough. It is for the jury to decide whether the Municipalities had actual or constructive notice of the dangerous condition and whether the danger could have been addressed with appropriate remedial devices that would have prevented the fatal accident. Likewise, whether Dereno was negligent and the supervening cause of the fatal accident is a question for the jury. Accordingly, we reverse the grant of summary judgment to Ross Township and West View Borough and remand the matter to the trial court for further proceedings consistent with this opinion.

_____<br>
MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pamela Angell, individually and as : 
the Administratrix of the Estate of : 
Thomas W. Bauer, Jr., deceased, : 
               Appellant : 
                : 
           v. :   No. 458 C.D. 2015
                : 
James F. Dereno, Ross Township, : 
and West View Borough : 

## **O R D E R**

AND NOW, this 10th day of March, 2016, the orders of the Court of Common Pleas of Allegheny County dated March 4, 2015, in the above-captioned matter granting the motion for summary judgment filed by Ross Township and the motion for summary judgment filed by West View Borough, dismissing all claims against them and entering judgment in their favor are hereby REVERSED and the matter is REMANDED for further proceedings.

       Jurisdiction relinquished.

 

_____
MARY HANNAH LEAVITT, Judge